**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-1462-WJM-KLM

JOHN DOE,

              Plaintiff,

     v.

THE BOARD OF REGENTS FOR THE UNIVERSITY OF COLORADO, and,

PHILLIP DiSTEFANO, Chancellor for the University of Colorado Boulder, in his Official Capacity,

            Defendants.

---

**PLAINTIFF'S AMENDED COMPLAINT**

---

**COMES NOW** the plaintiff, John Doe, by and through his attorneys, Lawrence S. Mertes P.C., and submits the foregoing Amended Complaint:

## I.      PARTIES AND GENERAL ALLEGATIONS

1.     Plaintiff John Doe (*hereinafter* "Plaintiff" or "Doe") is a resident of the State of New Jersey and was, prior to February 14, 2017, when he suffered expulsion, enrolled as a full-time student at the University of Colorado at Boulder ("CU Boulder").

2.     The University of Colorado ("CU") is the flagship public university system for the State of Colorado and is governed by the Board of Regents of the University of Colorado, which consists of nine members charged by Colorado's Constitution with the general supervision of the university system and the exclusive control and direction of all funds of and appropriations to the university system unless otherwise provided by

law. *See* C.R.S. § 23-20-102

3.      Phillip DiStefano ("DiStefano") is the 11th Chancellor at CU Boulder. He was appointed to his position on May 5, 2009, and acts as the chief executive and academic officer of the campus. He is responsible for the leadership and direction of the Boulder campus. He reports to the President of the University system and the Board of Regents and is the direct reporting supervisor of the director of the Office of Institutional Equity and Compliance at CU Boulder (OIEC).

4.      The Office of Institutional Equity and Compliance at CU Boulder (OIEC) was founded[i] to address all complaints of discrimination and harassment for the CU Boulder campus using the methods generally described in OIEC's Process and Procedures which, at the time of the OIEC investigation of Doe, specifically included:

a.      Employment of a victim-centered investigation model which negates fundamental notions of impartiality and objectivity in sexual misconduct investigations and fails to address victim misconduct in which the alleged victim could stand accused of the same prohibited behavior as alleged to have been committed by the respondent student;

b.      A failure to electronically record any witness statement taken by investigators, including those made by a complaining witness, thereby denying due process to respondent students;

c.      A failure to require witnesses to provide their statements under oath or affirmation of truthfulness or otherwise subject those providing statements to any penalty of perjury, thereby denying due process to respondent students;

2

d.      The redaction and summarization of witness statements to include the permanent removal of portions of statements that investigators alone deem "non-relevant" to the investigation including the subsequent destruction of notes from original interviews, thereby denying due process to respondent students;

e.      A failure to provide respondent students access to summarized statements of the complainant and witnesses prior to responding to an interview request or interview by investigators, thereby denying due process to respondent students;

f.      A failure to permit confrontation and cross-examination of witnesses in any meaningful fashion during an investigation, thereby denying due process to respondent students;

g.      Factual findings of responsibility in OIEC investigations are made by the same investigators who conduct the investigation, thereby denying due process to respondent students;

h.      Punishment for findings of responsibility are administered by the investigation team's supervisor, the director of OIEC, a procedure which calls for OIEC to be both the fact finder and the judge, thereby denying due process to respondent students;

i.      A failure to provide any administrative appeal at of a sanction imposed by the OIEC Director upon respondent students being found responsible for Code violations, thereby denying due process to respondent students.

(See Attachments A and B, 2015-16 OIEC Policies and Procedures and 2016-17

3

OIEC Policies and Procedures.)

5.      The executive director of OIEC at CU Boulder is Valerie Simons ("Simons"), who also serves as the CU Boulder Title IX Coordinator and supervises a team of investigators at OIEC.

6.      In September 2016, Simons directed the commencement of an OIEC investigation of Doe after OIEC learned of a Boulder Police investigation concerning the possible sexual assault of a CU Boulder female undergraduate student (hereinafter "Complainant") at an off-campus fraternity party which occurred in April of 2016.

7.      Complainant specifically objected to OIEC's investigation of the matter and refused to participate in OIEC's investigation.

8.      Upon information and belief, none of the parties to this action are in the military service, minors, or incompetent persons.

## II.      JURISDICTION AND VENUE

9.      This case arises in part under the laws of the United States, specifically 42 U.S.C. § 1983 and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §§ 1681 et seq.  Accordingly, this Court has jurisdiction in this matter pursuant to 28 U.S.C.  §§ 1331 and 1343.

10.     This Court also has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because Doe and the defendant are citizens of different U.S. states, to wit:

        a.      Doe is a resident of the state of New Jersey, where he maintains a residence and votes.

        b.      Defendant is situated, or otherwise lives and works, in the state of

Colorado, and represents a Colorado public university as chancellor.

11.    Upon information and belief, Defendant has expressly waived his immunity under the 11th Amendment of the Constitution of the United States for the state law claims presented in this action.

12.    Doe filed Notice of Injury by a Public Entity and an employee thereof pursuant to C.R.S. § 24-10-109. (Attachment C).

13.    This court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1931 as the defendant is a resident of the state in which this district is located, and a substantial part of the events or omissions giving rise to this claim occurred in this district.

14.    Incorporating the State of Colorado's statutes of limitations (see C.R.S. § 13-80-102), the two-year statute of limitations for this matter has not expired.

### III.    FACTUAL BACKGROUND: TITLE IX

15.    On June 23, 1972, the president of the United States signed into law Title IX of the Education Amendments of 1972, 20 U.S.C.A. ¶ 1681, et seq.  Title IX is a comprehensive federal law that prohibits discrimination on the basis of sex in any federally funded education program or activity.

16.    The principal objective of Title IX is to avoid the use of federal money to support sex discrimination in education programs and to provide individual citizens effective protection against those practices.  Title IX applies, with few exceptions, to all aspects of federally funded education programs or activities[ii].

17.    Title IX provides in part that "No person in the United States shall, on the basis of

sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program[iii] or activity receiving Federal financial assistance."

18.     Both the Department of Education ("DOE") and the Department of Justice (DOJ) have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student … complaints alleging any action which would be prohibited by Title IX or the regulations thereunder." 34 C.F.R. § 106.8(b) (DOE); 28 C.F.R. § 54.135(b) (DOJ).  Such prohibited actions include all forms of sexual harassment including sexual intercourse, sexual assault, and rape[iv].

19.     The Office of Civil Rights (OCR) within the DOE provides policy guidance within the realm of Title IX which serves to notify schools and other recipients of federal funds of their legal obligations and the ways OCR enforces federal civil rights laws, helping them to comply with the law. In some instances, the guidance that OCR issues directly responds to emerging trends in discriminatory behavior, requests OCR receives for technical assistance, and complaint investigations. When precedent-setting cases in the courts clarify specific elements of application of the law, over the years OCR has provided guidance in the form of "Dear Colleague" letters and accompanying supplementary materials, including "Questions and Answers on Title IX" to help ensure that the general public understands how decisions apply to schools, districts, and educational institutions of higher learning[v].

20.     Examples of Guidance and Dear Colleague letters issued by OCR include:

a.      "1997 Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties," (1997 *Guidance*) (March 1997) Published in the *Federal Register* at: 62 FR 12034.

https://www2.ed.gov/about/offices/list/ocr/docs/sexhar01.html

b.      2001 Dear Colleague Letter ("DCL 2001") (April 4, 2001).

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

c.      2006 Dear Colleague Letter ("DCL 2006") (January 25, 2006) (reaffirming Guidance provided by DCL 2001).

https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html

d.      2011 Dear Colleague Letter ("DCL 2011") (April 4, 2011).

https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html#Preamble

e.      "2011 Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" (2011 *Guidance*) (April 4, 2001).

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html

f.      "2014 Questions and Answers on Title IX and Sexual Violence," issued by the Office for Civil Rights at the U.S. Department of Education ("2014 Q&A") (April 29, 2014).

https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf

g.      "2017 Withdrawal of DCL 2011 and 2014 Q&A Guidance" (2017 Withdrawal) (September 22, 2017).

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf

h.      "2017 Questions and Answers Guidance" ("2017 Q&A") (September 22,

2017).

https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

21.     The 2001 DCL updated the Guidance provided in 1996 after several supreme

court decisions and, after restating the critical importance of recognizing when sexual

harassment has occurred (as noted in Section D, The Role of Grievance Procedures),

OCR announced that schools are required by the Title IX regulations to adopt and

publish grievance procedures providing for *prompt and equitable resolution of sex*

*discrimination complaints* (including complaints of sexual harassment) and to

disseminate a policy against sex discrimination[vi].

22.     The 2001 DCL observed that by having a strong policy against sex discrimination

and *accessible, effective, and fairly applied grievance procedures*, a school is telling its

students that it does not tolerate sexual harassment and that students can report it

without fear of adverse consequences.  (Emphasis provided.)

23.     The 2001 DCL identified several elements to be utilized in evaluating whether a

school's grievance procedures are prompt and equitable, including adequate, reliable,

and *impartial* investigation of complaints, including the opportunity to present witnesses

and other evidence. (Emphasis provided.)

24.     Concerning the Due Process Rights of the Accused, the 2011 DCL noted, "A

public school's employees have certain due process rights under the United States

Constitution. The Constitution also guarantees due process to students in public and

State-supported schools who are accused of certain types of infractions. The rights

8

established under Title IX must be interpreted consistently with any federally guaranteed due process rights involved in a complaint proceeding. Furthermore, the Family Educational Rights and Privacy Act (FERPA) does not override federally protected due process rights of persons accused of sexual harassment. Procedures that ensure the Title IX rights of the complainant, while at the same time according due process to both parties involved, will lead to sound and supportable decisions. Of course, schools should ensure that steps to accord due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant. In both public and private schools, additional or separate rights may be created for employees or students by State law, institutional regulations, and policies, such as faculty or student handbooks and collective bargaining agreements. Schools should be aware of these rights and their legal responsibilities to individuals accused of harassment.

25.     Nothing in Title IX, the 2001 DCL, nor any DOE/OCR guidance *prior to* 2011 mandates or discusses requiring the employment of the "preponderance of evidence" standard to assess compliance or make determinations regarding responsibility; rather, the 2001 DCL provided schools with wide latitude to adopt policies and procedures best fitting each particular institution.

26.     The standard of proof for student conduct matters at CU Boulder prior to the 2011 DCL -- including those involving sexual misconduct – was "clear and convincing evidence."

27.     The 2011 DCL noted that Title IX regulation requires schools to provide equitable grievance procedures which included investigations and hearings to determine whether

sexual harassment or violence occurred but for the first time asserted that "In addressing complaints filed with OCR under Title IX, OCR reviews a school's procedures to determine whether the school is using a preponderance of the evidence standard to evaluate complaints."

28.     The 2011 DCL's justification for requiring implementation of the preponderance standard for assessing evidence noted that "The Supreme Court has applied a preponderance of the evidence standard in civil litigation involving discrimination under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e *et seq.* like Title IX."

29.     The 2011 DCL accorded no consideration to whether its determination to legislate via a Guidance document the mandatory lowering of the standard of proof at schools such as CU Boulder would statistically increase the probability of false findings of responsibility, even though scientific studies have demonstrated exactly such an increased risk.  <u>See</u> "A Probabilistic Framework for Modelling False Title IX 'Convictions' Under the Preponderance of The Evidence Standard," John Villaseno, *Law, Probability and Risk*, Volume 15, Issue 4, 1 December 2016, Pages 223–237 (hereinafter "Probability & Risk article").  <u>https://doi.org/10.1093/lpr/mgw006</u>

30.     The 2014 guidance restates the 2011 DCL requirement that "any procedures used for sexual violence complaints, including disciplinary procedures, must meet the Title IX requirement of affording a complainant a prompt and equitable resolution … including applying the preponderance of the evidence standard of review."

31.     Both the 2011 DCL and the 2014 Guidance reiterate the need for prompt and

equitable resolution of a complaint while also embracing a victim-centric model. This model focuses disciplinary procedures primarily on the respondent with the intent of minimizing the burden on the complainant by way of transferring alleged perpetrators away from shared classes or housing and by aggressively pursuing complaints.

32.     The 2014 Guidance, in addressing the need for an appeals process, notes that "while Title IX does not require that a school provide an appeals process, OCR does recommend that the school do so where procedural error or previously unavailable relevant evidence could significantly impact the outcome of a case or where a sanction is substantially disproportionate to the findings. OCR requires that if a school chooses to provide for an appeal of the findings or remedy or both, it must do so equally for both parties," basically ignoring the concept of double jeopardy.

33.     For students who are accused of misconduct for non-sexual offenses, CU Boulder executes a higher level of due process protections than it does for those who are accused of sexual misconduct to include provision for a "formal[vii]" process by:

>    a.     Allowing internal CU Boulder appeals and stays of student conduct sanctions [viii].

>    b.     Allowing consideration of the submission of questions to an accuser and other witnesses[ix].

>    c.     Permitting the sealing of student conduct matters, excluding cases involving expulsion.

34.     The differing due process protections provided at CU Boulder for cases involving student misconduct versus student sexual misconduct resemble Brandeis University's

decision to create differing levels of proof for findings of responsibility for student misconduct versus student sexual misconduct. The district court disapproved. <u>Doe v. Brandeis</u>, 177 F.Supp.3d. 561, 606-07 (D. Mass. 2016) (held: For virtually all other forms of alleged misconduct at Brandeis, the more demanding standard of proof by "clear and convincing evidence" is employed. The selection of a lower standard (presumably at the insistence of the United States Department of Education) is not problematic standing alone; that standard is commonly used in civil proceedings, even to decide matters of great importance. Here, however, the lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend -- both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. <u>In context, the lower standard may thus be seen as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused</u>."  (Emphasis supplied).  See also Student Conduct Code Policies & Procedures 2015-2016 (Attachment D), and 2016 –17 (Attachment E).

35.    Following the release of the 2011 DCL, OCR began pressuring colleges and universities to aggressively pursue investigations of sexual assaults on campus according to published reports issued since the release of the 2011 DCL, to wit:

a.    In February 2014, DOE Assistant Secretary Catherine E. Lhanon, author of 2011 DCL, told college officials attending a conference that schools need to make "radical" changes. According to the Chronicle of Higher Education, college

12

presidents suggested afterward that there were "crisp marching orders from Washington."  "Colleges Are Reminded of Federal Eye on Handling of Sexual Assault Cases," *Chronicle of Higher Education*, February 11, 2014.

https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703

b.      The Dear Colleague Letter was a step in the increased enforcement of Title IX at colleges and universities. National Public Radio ("NPR") described the letter as the government's "first warning shot." See "How Campus Sexual Assaults Came to Command New Attention," NPR, August 12, 2015.

https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

c.      The Huffington Post and other media outlets reported in March 2015 that the number of Title IX sexual violence complaints received by DOE jumped from just 20 in fiscal year 2009 to 123 in fiscal 2014. As of April 8, 2015 — a little over halfway through the fiscal year — the department had received 68 complaints, leading the Office of Civil Rights to hire 210 full time employees.

https://www.huffingtonpost.com/2015/05/05/sexual-assault-backlog-education-department_n_7215748.html

d.      On May 1, 2014, DOE disclosed for the first time the names of colleges (55 in all) that were under investigation for possibly violating federal rules aimed at stopping sexual harassment. This list included CU Boulder with a case opened against them on June 18, 2013, and the University of Colorado at Denver with a case opened against them on April 29, 2014. https://www.ed.gov/news/press-

releases/us-department-education-releases-list-higher-education-institutions-

open-title-ix-sexual-violence-investigations

e.      Since the issuance of the 2011 DCL, the DOE has conducted 458

investigations of schools for possibly mishandling reports of sexual violence.

https://projects.chronicle.com/titleix/

f.      Lhanon was quoted in the LA Times stating, "We don't treat rape and

sexual assault as seriously as we should . . . [There is] a need to push the country

forward." David G. Savage and Timothy M. Phelps, "How a Little-Known

Education Office Has Forced Far-Reaching Changes to Campus Sex Assault

Investigations," *LA Times*, August 17, 2015. http://www.latimes.com/nation/la-na-

campus-sexual-assault-20150817-story.html

36.     Following the 2011 DCL, institutions including CU responded to the DOE's

cascading threats of investigation and sanctions -- including loss of federal monies -- by

knuckling under to DOE demands to lower the standard of proof and lessen the due

process rights of impacted students. To wit:

a.      The Federal Government has exerted pressure on colleges and

universities to treat all those accused of sexual misconduct with a presumption of

guilt. The Chronicle of Higher Education noted that "Colleges face increasing

pressure from survivors and the federal government to improve the campus

climate."  "Presumed Guilty: College Men Accused of Rape Say the Scales Are

Tipped Against Them," *Chronicle of Higher Education*, September 1, 2014.

https://www.chronicle.com/article/Presumed-Guilty/148529 .

b.      In the same article, the *Chronicle* noted that different standards were applied to men and women.  "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex and therefore responsible for gaining the woman's consent."

c.      Lhanon told a national conference at Dartmouth in the summer of 2014, "I will go to enforcement, and I am prepared to withhold federal funds."  "How Campus Sexual Assaults Came to Command New Attention," NPR, August 12, 2014. https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention

d.      In that same article, Anne Neal of the American Council of Trustees and Alumni was quoted as saying, "There is a certain hysteria in the air on the topic . . . It's really a surreal situation, I think."  She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

e.      On June 26, 2014, Lhanon told a Senate Committee, "[The Obama Administration] is committed to using all its tools to ensure that all schools comply with Title IX."  Further, "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against

15

the school. To revoke federal funds -- the ultimate penalty -- is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources, and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments." See https://www.gpo.gov/fdsys/pkg/CHRG-113shrg22618/html/CHRG-113shrg22618.htm; https://www.help.senate.gov/imo/media/doc/Lhamon.pdf

f.      Robert Dana, dean of students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that can't help but be true," he says. "Colleges and universities are getting very jittery about it."  "Some Accused of Sexual Assault on Campus Say System Works Against Them," NPR, September 3, 2014.  https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them

37.    Addressing the patent unfairness embraced in the 2011 DCL, critics argue that adjudication procedures are unfair to the accused because they presume guilt or deny basic due process rights; they have criticized the Dear Colleague Letter, its requirements, or a particular school's implementation of those requirements. This includes a group of 28 Harvard Law faculty members who in 2014 penned an open letter published in the Boston Globe criticizing Harvard's new sexual assault policy as "inconsistent with many of the most basic principles we teach."  The procedures, they

claimed, "lack[ed] the most basic elements of fairness and due process [and were] overwhelmingly stacked against the accused." Specifically, they cited "the absence of any adequate opportunity to discover the facts charged and … provides no details of the hearing process at all, only that the school expects the parties to meet with staff as needed" and that the school will "take all reasonable steps necessary to complete the investigation within 90 calendar days".

38.    Other critics argued that consequences of being found guilty by a campus tribunal, while not as severe as in the criminal system, are still very real and "can mean both expulsion and a career-destroying black mark on your permanent record." A mixture of students, lawyers, and commentators are beginning to claim that the social and governmental pressures on colleges to crack down on sexual assaults have created a situation where accused students must affirmatively prove their innocence. Source: "Not Yet Enough: Why New York's Sexual Assault Law Does Not Provide Enough Protection to Complainants or Defendants," Nicolo Taormina, *Journal of Law and Policy*, Volume 24, Issue 2 Article 6, pages 621-22 (2016).

https://brooklynworks.brooklaw.edu/cgi/viewcontent.cgi?article=1513&context=jlp

39.    In July of 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short in Addressing Sexual Assault," The Huffington Post, July 4, 2016. https://www.huffingtonpost.com/entry/college-sexual-assault-white-house_us_5779c6c2e4b0416464105ca7

40.    Prior to the 2011 DCL, academic discipline lawsuits "were (a) much less frequent

and (b) as likely as not to arise from matters closer to the core of the academic process, such as cheating." *Doe v. DiStefano,* 2018 WL 2096347 at 9 (D. Colo. 2018).

41.    However, since the 2011 DCL, this has changed. "The overwhelming majority of academic discipline lawsuits arise from sexual misconduct allegations that in most cases could also be the basis of a felony prosecution." *Id.*

42.    In a speech made at George Mason University on September 7, 2017, Secretary of Education Betsy DeVos articulated reasons for the changes that came with the subsequent release of the 2017 DCL and 2017 Q&A Guidance. Those reasons include the following: "A system is not fair when the only students who can navigate it are those whose families can afford to buy good lawyers — or any lawyer at all. [b] No school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by — or loss of funding from — Washington. [c] For too long, rather than engage the public on controversial issues, the Department's Office for Civil Rights has issued letters from the desks of un-elected and un-accountable political appointees. In doing so, these appointees failed to comply with basic legal requirements that ensure our so-called 'fourth branch of government' does not run amok. Unfortunately, school administrators tell me it has run amok. The Office for Civil Rights has 'terrified' schools, one said. [d] Another said that no school feels comfortable calling the Department for simple advice, for fear of putting themselves on the radar and inviting an investigation. [e] One university leader was rightly appalled when he was asked by an Office for Civil Rights official, 'Why do you care about the rights of the accused?' [f] Instead of working with schools on behalf of students, the prior

administration weaponized the Office for Civil Rights to work against schools and against students. [g] One administrator summed this up clearly when he told me his staff should be 'forward looking advocates for how to stop sexual misconduct.'"  Source: https://www.washingtonpost.com/news/grade-point/wp/2017/09/07/transcript-betsy-devoss-remarks-on-campus-sexual-assault/?tid=a_inl&utm_term=.9e7c1c1252b6

43.    On September 22, 2017, Secretary Devos announced the issuance of the 2017 DCL and 2017 Q&A Guidance providing new Interim Guidance for Title IX designed to "help schools as they work to combat sexual misconduct and will treat all students fairly." Secretary DeVos noted that "Schools must continue to confront these horrific crimes and behaviors head-on. There will be no more sweeping them under the rug. But the process also must be fair and impartial, giving everyone more confidence in its outcomes."  https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct

44.    The 2017 Q&A Guidance answers the question of "What is an equitable investigation" by stating, in pertinent part:

    a.    In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v). 11 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); see also 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "include a prompt, fair, and impartial process from the initial investigation to the final result")[x].

b.      Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking[xi], and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A). 13 2001 Guidance at (IX); see also 34 C.F.R. § 668.46(k)(3)(i)(A).

c.      The 2017 Q&A Guidance also states that in every investigation conducted under the school's grievance procedures, *the burden is on the school — not on the parties — to gather sufficient evidence to reach a fair, impartial determination* as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed, and that a person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. *Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.* (Emphasis provided.)

d.      2017 Q&A Guidance advises that an equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence — *including both inculpatory and exculpatory evidence — and take into account the unique and complex circumstances of each case*.  (Emphasis provided.)

e.      Any rights or opportunities that a school makes available to one party

during the investigation should be made available to the other party on equal terms.

f.      Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable.

g.      Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.

h.      Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation.

i.      The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence.

j.      *The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings*. (Emphasis provided.)

k.      Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

45.    Addressing what standard of proof a school should apply when evaluating a claim of sexual misconduct, the 2017 Q&A Guidance states that the standard of proof should be consistent with the standard the school applies in other student misconduct

21

cases.

46.     When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking[xii].

47.     The allegation brought against Doe was dated September 30, 2016 (and concerning an allegation made on April 3, 2016), less than a year before the issuance of the 2017 DCL and 2017 Q&A Guidance and before Secretary Devos rescinded the previous administration's guidelines.

48.     In response to Secretary Devos' withdrawal of the 2011 DCL and 2014 Q&A, CU Boulder and all other affected schools were invited by the DOE to reassess their use of the preponderance standard and were free to return CU Boulder's standard to the previous clear-and-convincing standard on an interim basis as formal notice and comment rulemaking on regulations were underway.

49.     As reported in the Boulder Daily Camera on September 22, 2017, CU Boulder declined to return to the clear-and-convincing standard. Simons was quoted as stating, "There will be no immediate changes to either our sexual misconduct policy or our OIEC policy. Having said that, we are always reviewing all of our policies and procedures to ensure compliance with federal and state law."

Source: http://www.dailycamera.com/cu-news/ci_31324185/cu-stick-obama-era-policies-campus-sex-assault

## IV.     TITLE IX AT CU BOULDER

50.     In recent years, including periods preceding and subsequent to the disciplinary

actions against John Doe, there has been substantial criticism of CU, including

allegations that the university does not take seriously complaints of females alleging

sexual assault by males.

     a.     In 2007, the University of Colorado settled a lawsuit against a former

female student for $2.5 million after they allegedly mishandled her complaint that

she had been raped by male students. This made national news as the "CU

Football Scandal."

     b.     In 2014, the University of Colorado settled a lawsuit with a female student

for $32,500 because she alleged that the resolution of her complaint took too

long.

     c.     In 2017, the University of Colorado, through OIEC, suspended Defendant

DiStefano for not immediately reporting an allegation of domestic abuse against

an assistant football coach. Defendant DiStefano had delayed reporting,

ostensibly trying to determine whether the school had jurisdiction.

     d.     Defendant DiStefano is currently being sued in relation to the alleged

failure to properly respond to those allegations.

     e.     Defendant DiStefano is also being sued for failure to provide adequate

due process in sexual misconduct investigations at the university. See *Doe v.

DiStefano,* 16-cv-1789-WJM-KLM.

     f.     Further history of the University of Colorado mishandling sex-based

harassment and assault are detailed in that case (1:17-cv-02140, D. Colo.).

These include a 1997 allegation of a high school female being raped by college

football players, a football player being molested and raped by teammates in

1999, a sexual assault by an assistant coach against two female trainers, a 2006

failure to report an alleged sexual harassment, and multiple other "failure to

report" issues.

51.     All these cases contributed to the University of Colorado's "crack down" on

alleged sexual misconduct. The University of Colorado was under investigation by the

OCR from 2013 through September of 2017. The complaint against Doe was filed

during this time; the investigation and sanctioning of Doe also took place during this

time.

52.     CU has adopted certain policies and procedures for the investigation and

adjudication of alleged sexual misconduct as required by Title IX. This is a separate

policy from other student misconduct.

53.     The policies and procedures[xiii] for the school term 2015-16 and 2016-17 are

found in separate documents titled "Institutional Equity and Compliance, University of

Colorado Boulder, Process and Procedures 2015-16" and "Institutional Equity and

Compliance, University of Colorado Boulder, Process and Procedures 2016-17" ("OIEC

Process"), Attachments A and B.

54.     The OIEC Process asserts jurisdiction over conduct occurring off university

property if it "has a potential continuing effect on campus including, but not limited to,

adversely affecting the health, safety, or security of any member of the university

community or the mission of the university." The OIEC Process provides a comprehensive list of sexual misconduct matters which are considered to be "prohibited conduct" and also definitions applicable to sexual misconduct matters which diverge from definitions provided under Colorado law for prohibited criminal sex acts and behaviors.  OIEC Process, (C)(1)(b), p 3-4, and (G)(1-2), p 7-9.

55.     OIEC Process also includes an unusual added requirement for "affirmative consent," to wit, "the unambiguous and voluntary agreement to engage in a specific sexual activity." Consent is "clear, knowing, and voluntary words or actions which create mutually understandable clear permission regarding willingness to engage in, and the conditions of, sexual activity. Consent must be active; silence by itself cannot be interpreted as consent. Consent is not effectively given if it results from the use of force, including threats, intimidation, or coercion, or if it is from someone who is incapacitated."[xiv] Affirmative consent "will be determined using both objective and subjective standards.  The objective standard is met when a reasonable person would consider the words or actions of the parties to have manifested an agreement between them to do the same thing, in the same way, at the same time, with one another.  The subjective standard is met when a party believes in good faith that the words or actions of the parties manifested an agreement between them to do the same thing, in the same way, at the same time, with one another."[xv]

56.     OIEC Process follows an "investigative model"[xvi]" whereby investigators interview the complainant and the respondent separately and provide each party the opportunity to be heard and to respond before making findings of fact and responsibility. There are

<u>no formal hearings</u>. Under this model, accused students are **denied** the following rights:

a.      The right to confront and cross-examine witnesses, including a student's accuser.

b.      The right to access the full statement of any witness or the complainant. (Instead, notes of witness testimony are taken by hand, and investigators only record information they deem to be relevant. The notes are subsequently destroyed. Investigators determine what is relevant to them without further guidance from the OIEC Process, Constitutional law, case law, or rules of evidence or procedure.)

c.      The right to have a witness or complainant swear an oath or affirmation of truthfulness as to statements provided to OIEC investigators.

d.      The right to an independent judge of the facts and sanctions, if any.

e.      The right to an appeal.[xvii]

57.      Sanctions available to OIEC upon a finding of responsibility include:

a.      Warning/Written Reprimand

b.      Educational Sanctions

c.      Residence Hall Reassignment

d.      Residence Hall Termination

e.      Probation

f.      Restriction or Denial of University Services

g.      Delayed Conferral of Degree

h.      Withholding of Official Transcript

i.      Suspension

j.      Exclusion

k.      Expulsion

l.      Recommendation for Revocation of Degree

m.      Additional Sanctions imposed within the discretion of the OIEC director or

her designee.

58.    Notwithstanding the range of possible sanctions OIEC has published, there

exists "presumptive sanctions"[xviii] for sexual misconduct.

59.    The CU Student Conduct Code applied for punishing non-sexual misconduct

does not contain "presumptive sanctions" applicable to students who are found

responsible; it provides additional rights to accused students under that code.

Attachment D and E (2015-16 CU Boulder Student Conduct Code and 2016-17 CU

Boulder Student Conduct Code).

## V.    FACTUAL BACKGROUND RE ALLEGATIONS MADE AGAINST DOE
## (BOULDER POLICE REPORT)

60.    On April 2, 2016, a party was held at the Phi Kappa Psi fraternity house (PKP) in

Boulder, Colorado.

61.    Doe, who is a member of PKP, was in attendance at the party.

62.    Complainant, then a student at CU Boulder, went to the PKP party which started

on Saturday, April 2, 2016, and lasted into the early morning of Sunday, April 3, 2016.

Complainant attended with several friends who later left her at the PKP party while they

sought out food.

63.     On April 4, 2016, Complainant sought assistance from the Emergency Room at Boulder Community Health (BCH) at which time Boulder Police agents (BPD) were summoned on a mandatory sex assault report due to Complainant's concern that she had possibly been drugged and sexually assaulted at the PKP house.   Attachment F (BPD report).

64.     Complainant relayed to BPD that she remembered waking up at 12:30 pm on April 4, 2016, at her own home. She was told by one of her friends who had been out with her on April 3, 2016, that she had been found naked and crying inside a room at the PKP house.

65.     Complainant advised the friend that she had limited memories of the party and the evening and told the friend (and later BPD agents) that she felt that she had been drugged and was not simply drunk[xix].

66.     Complainant further reported that when she woke she had a headache, felt sick, had difficulty swallowing, her nose was burning, she was coughing, her throat felt sore, and that she was experiencing intense low back pain causing her difficulty breathing.

67.     At BCH, BPD agents noticed dark discoloration on the right side of Complainant's neck.

68.     Complainant advised BPD agents that the last thing she remembered seeing was a PKP member's face, identified in OIEC documentation as W4.

69.     During a follow-up interview with BPD agents on April 6, 2016, Complainant reported the following additional information:

        a.      That on April 2, 2016, she had gone with several sorority sisters to two

different fraternity parties, one at Sigma Psi fraternity (which she left at 1:00 a.m.) and a second at PKP.

b.      That she started drinking at 10:30 p.m. on April 3, 2016, and stopped drinking at 12:15 a.m. on April 4, 2016, further advising that she had consumed no medications or drugs.

c.      That she consumed two shots of alcohol in her dormitory prior to the event and approximately four more shots throughout the night and that she was consuming alcohol from a 1.75-liter bottle with her companions.

d.      That after arriving at PKP, her friends left to get food and she remained at the PKP house, reporting that she had some close guy friends at PKP and that she felt "almost completely sober."

e.      That as her friends left her, she observed a PKP member (identified as W4 in the OIEC report) at the top of some stairs at the PKP house, and that she considered W4 to be either a friend or an acquaintance. However, she also reported that her memory cut out after this encounter and that she woke up in the middle of the night to remove her bra and a bralette before putting on a sports bra, because she felt uncomfortable and then next awoke later in the morning in bed feeling ill and felt that it was "weird" that she was so hung over since she did not "drink much alcohol."

f.      Complainant reported to BPD that she was questioned by her roommate upon waking that morning. Complainant's roommate felt that she was behaving oddly and not acting like herself.

29

g.      Complainant advised that she began checking her phone's text messages and that a friend (identified in the OIEC investigation as P1) had advised her that she had been found at the PKP house in someone's room, naked and crying, that she resisted help getting dressed, and that she was missing her shoes.

h.      Complainant reported that since she woke on April 3, 2016, she had been texting guys at PKP to "figure out what happened" and was "getting different stories" but had learned the name of the individual she had been "with" that evening and learned that she had been in the room of PKP member (identified in the OIEC investigation as W9) that evening and was told by a PKP member (identified in the OIEC investigation as W10) that she had "hooked up with" someone in W9's bed while W9 was at a concert, a person that W9 identified as Doe.

i.      Complainant advised BPD agents on questioning that she did feel like she had sex the next morning and that her vagina was swollen.

70.     On April 11, 2016, OIEC received a report from a CU Residence Life Employee regarding the April 13, 2016, allegations made to BPD about the possible drugging and sexual assault of Complainant at the PKP party.

71.     Complainant met with BPD agents on April 12, 2016 and expressed reservations about continuing with a police investigation.

72.     On April 13, 2016, Complainant emailed BPD agents to advise that she did exchange text messages with Doe, and that she did not wish to proceed with the investigation. She requested that the clothing that was taken from her as evidence by

BPD be returned to her.

73.     On September 29, 2016, OIEC obtained a redacted copy of the BPD report and

contacted Complainant about OIEC's intention to investigate the April 7, 2016, incident.

Complainant advised OIEC that she would not participate in any investigation involving

Doe or the PKP party.

74.     As described in its Final Report, OIEC asserts that it "weighed [Complainant's]

request for privacy against its obligation to provide a safe and non-discriminatory

environment for students, faculty and staff" before ultimately deciding that "based on the

serious nature of the allegations, including allegations of sexual assault via

incapacitation and the alleged physical injury to [Complainant] … it was necessary to

move forward and investigate the circumstances detailed in the BPD report."

Attachment G (Final Report).

75.     OIEC issued a Notice of Investigation (NOI) to Doe on September 30, 2016,

which alleged sexual misconduct with [Complainant], a fellow CU student, that violated

Section G2 of the Student Code, specifically "sexual assault (non-consensual

intercourse), sexual assault (non-consensual contact), and sexual harassment." The

NOI also requested that Doe provide a statement to Investigators[xx].  Attachment H (NOI

issued to Doe).

76.     November 2, 2017, Doe responded to the NOI by requesting access to OIEC

records include police reports and medical records referenced in the NOI.

Attachment I (Letter of Representation).

77.     Doe's request for access to witness statements and medical records was denied

by OIEC Investigators. Doe independently requested and received the redacted BPD report which alerted Doe to the possibility of felony charges being filed against Doe, for which the statute of limitations was ten (10) years. C.R.S. § 16-5-401(8)(a).

78.     Doe declined, through counsel, to be interviewed by OIEC investigators due to the possibility of prosecution, as well as the refusal by OIEC investigators to provide him with enough information regarding the allegations to permit an informed choice regarding cooperation with OIEC's process versus his Fifth Amendment right to remain silent.  Attachment J (Written Evidence Summary ("WES"), p2, FN3).

79.     On December 21, 2016, while Doe and other CU students were home for the holidays, Doe received the WES from OIEC which contained a summary of interviews from 23 witnesses, documentation from the Boulder Police Department (BPD), text messages, a video from the night of the incident, and references to materials and information in the possession of the Boulder County District Attorney's Office and Boulder Police Department, and an examination by a Sex Assault Nurse Examiner (SANE).  Further, OIEC requested that Doe respond to the WES within seven days, while Doe was still on winter break.

80.     Doe was not advised by OIEC that the complainant had requested both BPD and OIEC to drop their respective investigations until he received the WES.

81.     OIEC arbitrarily and capriciously denied Doe's request that he be permitted to delay provision of his response to the WES until after he returned to CU from winter break. OIEC provided two lesser extensions which did not remedy Doe's availability issues. OIEC also failed to address the fact that Doe had finally been provided *limited*

access to OIEC investigative materials on December 21, 2016, by virtue of a one-hour proctored viewing of a box of OIEC investigative materials which were prohibited from being copied or photographed. This one-hour review did not remedy OIEC's failure to adequately allow Doe to review the evidence against him.

82.     On January 10, 2017, Doe provided a reply to the WES which stated an objection on due process grounds and which noted that: a) Doe was asserting his Fifth Amendment right under the United States Constitution[xxi], and, b) Doe renewed his request that he be permitted to view all witness statements and investigatory material before responding to the WES. Doe requested an eight-day extension to review the evidence against him, which OIEC arbitrarily denied.  Attachment K.

83.     On January 23, 2017, Doe was allowed a proctored review of the investigation file in the offices of the OIEC, one day before OIEC investigators issued their Final Report.  Attachment G.  Further, Doe's opportunity to review the complete OIEC investigative file was limited in time to one hour, and he was restricted against photocopying or photographing any of the materials or documents. From this limited review, Doe learned:

       a.     Complainant had been pressured by a CU faculty member to report the incident but that, following a meeting with OIEC, Complainant specifically declined to pursue any charges and specifically requested that the matter be dropped.

       b.     OIEC investigators contacted Complainant's parents in an effort to make her pursue charges against Mr. Doe and maintained an active correspondence

with Complainant's parents in an effort to force her participation in the investigation. After failing in this effort, OIEC investigators proceeded with their investigation over Complainant's objections.

84.     Investigators in Doe's case produced a Final Report on January 24, 2017, which cherry-picked and massaged facts taken from witnesses' recollections of an intoxicated evening some six to eight months prior in order to create a finding of responsibility based upon "the totality of the circumstances." This finding was incomplete, inadequate, and drenched in a preordained finding of fault.  Attachment G.

### VI.     PURPORTED "FACTS" RELIED UPON BY OIEC INVESTIGATORS

85.     Starting in September of 2017 and lasting into December 2017, OIEC investigators in Doe's case forced an investigation into an incident which was first taken up and then abandoned by BPD at the request of the complainant in April of 2016. Following that, over the objection of the complainant herself, OIEC (at the direction of Defendant Simons) personally reviewed and reopened the investigation, despite the continued non-involvement of either the complainant or Doe, and without due consideration for the passage of time and state of intoxication of virtually every witness in the case.

86.     The Final Report issued by OIEC was far from a cold-eyed view of the facts and instead represented manufactured conclusions which were, and are, unsustainable, to wit:

a.     <u>Complainant's sobriety at the PKP is factually unknown</u>, other than that she had consumed some alcohol that evening.  This is unknown because:

34

1.      Early on, the complainant withdrew her cooperation in the BPD investigation. She *never* cooperated in the OIEC investigation.

2.      Witness statements establish that Complainant arrived at the PKP party from the first party at around 1:00 a.m. and was left behind by her friends (identified in the OIEC investigation as W1, W2, and W3) when they left the party to get food. They noted that Complainant remained behind "possibly to continue spending time with a man at the party." <u>For investigators who are without bias or an agenda,</u> this evidence might lead them to conclude that she was sober enough, in the opinions of her own friends, to be safely left at the party.

b.      <u>No evidence exists that the complainant was ever drugged, much less by Doe.</u>

c.      <u>The OIEC investigators relied upon witnesses whose sobriety or intoxication was never the subject of any "investigation" or questioning. Differences in what witnesses said was simply ignored or explained away by investigators indulging their investigative bias:</u>

1.      Simple questions such as "how much alcohol, drugs, etc., did you consume and over what period of time?" were not asked of any witness, at least according to the summarized statements that Doe was provided one hour to review and compare with what ended up the WES and Final Report. However, OIEC investigators are free to redact from any witness statement *anything* that they alone deem "irrelevant" from any witness

35

statement. A witness may have provided pertinent information on drug and/or alcohol consumption in their statement, <u>and no one would know</u> since witness statements aren't recorded and original notes are destroyed as a routine part of the investigative process at CU Boulder.

2.      What appears in a summarized statement is what an investigator wants to appear and is not subject to cross-examination or hearing. Further, this is considered adequate due process at CU Boulder.

d.      Investigators presented with contradictory facts consistently selected those facts which shaped an investigative conclusion of responsibility:

1.      On October 6, 2017 (approximately six months after the PKP party), W2 presented a video to investigators[xxii] showing the Complainant kissing an unknown man at the PKP party.  While the unidentified male might be an alternate suspect[xxiii], or at least a potential witness to the facts of the case, OIEC investigators neglected to follow-up with this person or provide an opportunity for Doe to do so himself by making a timely and meaningful disclosure of this evidence.

2.      On November 10, 2016 (approximately seven months after the PKP party), W3 told Investigators that the Complainant wanted to "hook-up" or "make out" with "some guy" at the party but that she could not identify him.

3.      On October 14, 2016 (approximately six months after the PKP party), W4 told investigators that he did not remember his own level of intoxication other than being "definitely impaired" and that he saw

Complainant at the party and she was very drunk.  W4 told investigators he could not recall receiving text messages from the complainant asking W4: "di (sic) we by chance hook up that night? Or did u see me w (sic) anyone?"

4.      On December 15, 2016 (approximately eight months after the PKP party), W6 told Investigators that no sex occurred between Complainant and Doe.  W6 also did not think the complainant was "high," said that Complainant held herself together, and that Doe himself told W6 that there was no sexual activity but that he and the girl had been in the bed together when W9 came into the bedroom, something at odds with the photograph taken by W9. Attachment L.

5.      On December 1, 2016 (approximately eight months after the PKP party), W7 advised investigators that he could not recall many of the details of the party but that he was asleep in W9's room and woke up to see Complainant present on W9's bed astride Doe "in full control" while having sex with Doe, in the room with three or four others.  W7 was on a couch with another person (later determined to be W8) observing the scene and seeing Doe's face when he later stood up.

6.      On December 8, 2016 (approximately eight months after the PKP party), W8 denied having specific memories of being in a room with W7 while Doe had sex with someone.  W8 did confirm she had passed out due to alcohol overconsumption and confirmed that she was pictured with

W7 in a second photograph taken by W9 when he entered his bedroom on the evening in question.

7.      On October 13, 2016 (approximately six months after the PKP party), W9 was interviewed and told investigators that he attended a concert in Denver and arrived back at the PKP house around 1:00 a.m. He found Doe "in [W9's] bed with a girl" and that "they were both passed out." W9 claimed that the girl had vomited on his clothing and a souvenir helmet and that he "dragged Doe out of his bed." This directly contradicts the photographic evidence showing Doe asleep at the side of W9's bed (Attachment L). When faced with this contradiction, W9 changed his story and said that Doe was not on the bed. W9 opined that both Doe and the girl were "fully clothed" but could not provide details.  W9 confirmed to investigators that he told the complainant who she was with in his room, sent the complainant the photo taken of her in bed, and was told by Complainant that she was the person photographed alone in his bed.

8.      On October 27, 2016 (approximately seven months after the PKP party), investigators interviewed W10, who attended a concert with W9 in Denver and who entered W9's room some four minutes after W9. W10 told Investigators that he "thinks the girl was wearing a bra and pants" and "was not naked" as far as he could remember.  W10 asserted that despite attending a concert, his memory was not "super impacted."

9.      On November 9, 2016 (approximately eight months after the PKP

party), investigators interviewed W11, who also attended the Denver concert with W9. W11 told investigators that she and W9 entered his darkened bedroom using their phones as flashlights and that she saw a guy and a girl in W9's bed and vomit on the floor, that the girl was not fully clothed but the bottom half of her body was covered by a blanket and a breast may have fallen out of her bra.  When asked by investigators "if anyone fell out of bed," W11 responded "the girl may have."  W11 could not identify Doe as the male party she saw with Complainant. W11 also reported that she and W9 drank alcohol in W9's room after returning from the Denver concert.

10.     On December 6, 2016 (approximately eight months after the PKP party), investigators interviewed W12, who reported being at the Denver concert with W9 and others and was with W9 when they walked into W9's bedroom.  W12 advised that he was "pretty drunk" and that his group entered the room "rambunctiously" and that two people who had been sleeping in W9's bed woke up quickly and seemed startled.  W12 stated that Doe and the girl were clothed "from what he could remember."  W12 advised that after the girl left W9's room, he went to another room and smoked some marijuana.  W12 told investigators that Doe "had not fallen off the bed" when he saw him and that he is "somewhat confident" in his recollection of the evening, although he noted that he was "drunk" after the concert in Denver.

11.     On December 6, 2016 (approximately eight months after the PKP party), investigators interviewed W13, who was with W9 and others at a concert in Denver and was with W9 when he entered his room.  W13 reported that he saw a girl passed out in W9's bed but that Doe was standing next to the bed and acting as if he was assisting the girl, that he believed both the girl and Doe were dressed (although he could not recall what they were wearing) and that the girl seemed intoxicated.

12.     On November 14, 2016 (approximately seven months after the PKP party), W14 told Investigators that he went to the Denver concert with W9 and others and returned at around 2:00 or 3:00 a.m., entering W9's room a minute after W9.  W14 said he saw a girl sitting on W9's bed vomiting and that she was fully dressed.

e.      The identity of a man who spoke to W1 at the PKP party is unknown.
The identity of the man who W1 reported was "just around," who she observed sitting with the complainant, and who purportedly told W1 that "there was a spare bed in the fraternity the complainant could sleep in, and that [he] would take care of her" remains unknown to this date. This could have been any male member or guest of the PKP house on that evening, despite the investigators' insinuation that the unknown man's height, described by W1 as being "very tall,[xxiv]" made it "likely" that this person was Doe. Final Report, p39 and FN 55.

f.      Fraternity policy regarding drunken guests is not necessarily a "factual occurrence."

40

1.     There is no evidence that "due to Complainant's state of intoxication she was offered a bed and taken to a bed in the PKP house per the fraternity's stated standard procedure for handling overly intoxicated partygoers" as alleged by investigators in the Final Report, p39 (relying upon statements made by W5 and by W6, who was also the PKP Fraternity's "risk manager").  The fact that a policy existed is not proof that the policy was made applicable to the complainant at this time and place. There were no witnesses who were able to say that this policy was carried out, and OIEC failed to even identify who allegedly offered Complainant a bed to sleep in.

2.     There exists a more insidious reason that the OIEC investigators insist that the PKP "drunken guest policy" discussed by W4 and W5 was factually implemented in this case:  If OIEC assumes this "fact," it facilitates the investigative fallacy that Doe isolated the complainant for the purpose of having sexual relations with her regardless of her intoxication or ability to provide consent.

3.     This assumed "fact" is disputed by physical evidence in the form of a photograph taken by W9, as well as all of the witness statements collected by investigators. These witnesses and the physical evidence place an apparently unconscious Doe on the floor and an apparently unconscious complainant on a bed in W9's room, accompanied by a multitude of other intoxicated individuals. This is a far cry from Doe

isolating the complainant from other persons.  Attachment G (Final Report) P39-40, FN 55, 56; Attachment L (Photograph).

4.      W6, who was acting as the Risk Manager for the PKP party, reported that when a visibly intoxicated person's friends cannot be reached or an Uber ride is not provided, the intoxicated person is taken to the "Alumni Room," which is blocked off and where chairs and water are situated – not a private bedroom.  Attachment G (Final Report) P18.

g.      <u>Investigators' conclusion that Complainant was "found" in bed with Doe is not factually provable and more likely than not untrue.</u>

1.      Doe does not dispute that the complainant was "found" in W9's bed by W9 and W10 (who were both drunk and admitted to having used drugs) when they returned from an evening concert in Denver.  Doe asserts that this evidence is factually established and then grudgingly acknowledged by investigators (Attachment G, Final Report, p22, FN 34), only to be casually ignored in reaching their desired conclusion.  Attachment G (Final Report) p40.

2.      The investigators were unsuccessful in their best efforts to find someone – anyone -- who would say that Doe had been situated in the bed with Complainant and then "fell out of the bed" in order to explain why Doe might be seen unconscious and on the floor of W9's room in W9's photo.  Investigators did get one witness, W11, to speculate that if anyone had the potential to fall out of bed it would have been the complainant.

Attachment G (Final Report) P28.

3.      OIEC investigators faced dizzying inconsistency of relevant times presented to them by the various witnesses, as they were attempting to recall months-old details from an event at which they were universally impaired or intoxicated by virtue of their ingestion of alcohol, drugs or both.  OIEC dispensed with these ubiquitous inconsistencies by simply noting that "sometime between 1:30 am and 3:30 am, Complainant was found in W9's bed with Respondent."  Exhibit F, Final Report p40.

4.      While photographic evidence disproves the notion that Doe was "found in bed" with Complainant, OIEC used this photographic evidence to conflate the presence of Doe in casual athletic clothing to facilitate his participation in a presumed sexual act with Complainant, based upon the comment of "witnesses" who stated that Doe would not have worn gym shorts to the party that night. OIEC used this conjecture concerning Doe's attire to find[xxv] that "at some point Doe's clothing worn to the party were also removed" and used this to support the preordained "investigative" conclusion which permeates through the report: "OIEC finds, more likely than not, (Doe) penetrated Complainant's vagina at some point during the encounter." Exhibit F (Final Report) p42.

h.      <u>The investigators' conclusion that "it was more likely than not" that Doe engaged in sexual intercourse is without factual foundation.</u>

1.      Complainant does not know what happened to her at the PKP

party. On one hand she reports being told that she was found naked and taken home by her friends (who were not present). On the other hand, she was photographed by W9 showing her to be wearing an article of clothing on the top of her torso and covered by a blanket from the waist down and sleeping alone in a bed in a room full of other college-aged students before she was awakened.  Attachment L (photograph), Attachment F (BPD report).

2.      OIEC investigators conflate Complainant's observation regarding her swollen and sore vagina, which is many times an indication of the onset of a woman's period, with non-consensual sexual intercourse even in the given circumstance under investigation in which a woman cannot recall being with a partner, much less engaging in a sexual act. https://www.healthline.com/health/womens-health/vaginal-swelling (periods, pregnancy and intercourse can all cause vaginal swelling). Further, the connection between Complainant's purported soreness and the onset of her period is buttressed by Complainant's report to BPD that she noticed this swelling in the context of inserting a tampon (e.g. inferring the start of her period which might well include vaginal swelling). Attachment F.

3.      OIEC attempts to factually establish sexual intercourse at the PKP party between Doe and Complainant via the "tall man" insinuation (per W1's statement), the much-contested assertion amongst witnesses that

Doe and the Complainant were in bed together, and an exchange of text messages obtained by OIEC investigators from BPD[xxvi] which purport to be between Doe and Complainant and which are presented as the lynchpin of the investigators' argument that sexual contact occurred between Doe and Complainant:

Party One (asserted to be Complainant):"hey is this (Doe)?"

Party Two (asserted to be Doe): "yeah"

Party One: "I think we hooked up last weekend at (the fraternity) do u remember?"

Party Two: "yeah i think so"

Party One: "I was just wondering if we used a condom? I can't remember and nothing's wrong i just wanted to ask to be safe"

Party Two: "I'm sorry I dont [sic] remember"

Party One: "okay r u sure? Sorry but I'm just asking cuz if we didn't use one I wanted to get tested but if we used one I wouldn't need to"

Party Two: "I don't know if we used one or now [sic]"

Party One: "have you been tested before"

Party Two: "No"

Party One: "do u think u could get tested for hiv? If you get tested and it comes out negative then the dr. won't have to put me on this 28 day medication that prevents hiv. they do rapid tests at

Wardenburg in [sic] pretty sure"

Party two: "I dont [sic] know I'll think about it"

Party one: "I'd really appreciate if u could do that cuz I can't drink on the meds and I leave for coachella tomorrow"

Party two: "Do you have hiv"

Party one: "no but they want to put me on meds just in case since u don't know if we used a condom or not"

Party two: "Then I'm not gonna get tested.  You're the first random person I've hooked up with in over a year and I don't have anything"

Party one: "ok that helps too then thanks"

Party two: "I'm sorry I just have two midterms and I don't have time right now"

4.      According to OIEC Investigators, the above text message exchange came after Complainant contacted numerous individuals at PKP to discover if they were her sexual partner the evening of the party or if they knew who might've had sex with her or at all.  Exhibit F (Final Report) OIEC referenced text messages between W4 and Complainant, p15-16. W4 is a never-investigated alternative suspect who was the last person the complainant recalled seeing and talking to before reportedly blacking out. W4 was asked by Complainant if he had "hooked up" with her or if he'd seen her with anyone.  W4 texted a reply advising that he "didn't think

46

<u>so</u> but [didn't] know if [she was] with anyone else."  In another string of text messages to the complainant, W9 expressed concern about damage done to his souvenir helmet from Complainant using it to catch vomit and asked whether the complainant was asking these questions because she was pregnant. W9 also texted Complainant Exhibit I (photo) and asked her if the woman depicted sleeping in his bed was her.  W9 also told Complainant that she had been with Doe but made no comment regarding sexual relations (Final Report, P21-22). Finally, W10, who was also contacted by Complainant, told her that she had hooked up with "someone" in W9's bed but did not provide the identity of the person she was with at that time.

5.     OIEC investigators were necessarily faced with cognitive dissonance by virtue of some witnesses who assert Complainant was too drunk (to consent to sex), and W7 who asserts that the Complainant was actively engaged in sexual relations (e.g. "in full control") in a public setting.  In order to dispense with this dissonance, OIEC Investigators default to an explanation consistent with a finding of responsibility by opining (without the benefit of science or expert opinion) that "when people experience blackouts they are capable of participating in 'emotionally charged' events such as intercourse with little or no recall. Therefore, even if W7 momentarily observed Complainant participating in the sexual intercourse, it does not dispute the fact that she was in a

blackout state."

6.     The SANE nurse examination of Complainant revealed no evidence of sexual assault, no report of semen or vaginal injury, and no indication of recoverable DNA.  Reference:  BPD report.

87.     OIEC ignored Complainant's demand that OIEC not investigate this matter. Upon information and belief, OIEC campaigned to force her involvement via active communications with Complainant's parents. Following this failure, OIEC Investigators determined that Complainant was "significantly impacted" by the alleged sexual conduct found to have occurred, citing only to investigative statements made by W2, W15, W16, and W23. Final Report p43.

88.     Doe notes that none of the statements by W2, W15, W16, and W23 cited by OIEC as being the basis for a finding of "significant impact" and "hostile environment" were concurrent with OIEC's Final Report made almost ten months after the PKP party. Doe also notes that the Final Report was entirely lacking *any* comment to OIEC investigators by the party reported to have been significantly impacted.

89.     On February 2, 2017, Doe, through counsel, requested Simons to recuse herself from the sanctioning decision upon a showing that she was not impartial under the University's Code of Conduct[xxvii].  The basis of this request was that Simons had involved herself in the investigative stage (e.g. reviewing evidence collected from BPD, citing her prerogative as Executive Director of the OIEC and Title IX Coordinator). Additionally, Simons had overridden the express wishes of the complainant (who at that time was no longer a CU student) that the investigation be discontinued.  Doe asserted

48

a conflict of interest in Simons' continued participation thereafter based upon the OIEC Process and Procedures.  Attachment B: OIEC's Process and Procedures (OIEC manual) 2016-17[xxviii] .

90.     Doe further requested that Simons identify the factors set forth in the Policies and Procedures that justified overriding the complainant's request.

91.     On February 14, 2017, Simons responded to Doe by first asserting that her decision to override the express request of the complainant "is consistent with my role as Executive Director of the OIEC and Title IX Coordinator."  Attachment M (Conflict Response letter).

92.      Simons' response on February 14, 2017, also stated: "Our records indicate the factors that I weighed on September 30, 2015, to determine whether to move forward with the investigation.  That information was available when your colleague Mr. McGuire (sic) inspected the files on January 23, 2017." Attachment M (Conflict Response Letter).

93.     Simons' final point in the February 14, 2017, response was a denial of partiality or conflict of interest "particularly as there have been no allegations that either I, or other investigators in this matter, have not followed applicable laws and policies."  Attachment M (Conflict Response Letter).

94.     Doe notes that in an unrelated subsequent investigative matter wherein Simons was asked to intervene and overrule a disputed action by an investigator, her contrary response indicating that she would avoid being involved in the investigative portion was: "Thank you for reaching out to me directly.  While I understand your request now

may be moot … <u>please note that I do not review cases before they are final so as to preserve my role at the administrative review stage</u>." (See Section C(5) of the OIEC Process and Procedures).  "If you have questions about that review process, or would like to discuss further, please let me know."  Attachment N.

95.     Based upon the foregoing, Plaintiff moves this Court to find that the defendant has violated Doe's Constitutional and Statutory Rights as set forth below:

### VII. COUNT I.

### (DECLARATORY JUDGMENT- VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES CONSTITUTION)

96.     Plaintiff repeats and incorporates all of the allegations of this Complaint as if fully set forth herein.

97.     This Count is brought against Defendant DiStefano in his official capacity.

98.     The Fifth Amendment to the United States Constitution, made applicable to the State of Colorado by the 14th Amendment, provides that no person shall "be deprived of life, liberty, or property, without due process of law."

99.     The 14th Amendment to the United States Constitution provides that no state shall deprive "any person of life, liberty, or property, without due process of law."

100.    The Due Process clauses of the United States Constitution are implicated by higher education disciplinary decisions, including the disciplinary decisions under the University of Colorado OIEC Process and Procedures.

101.    CU has a constitutional obligation to provide a fundamentally fair and reliable process.

102.    Doe is entitled, under the Constitution of the United States, to the opportunity to be heard in a meaningful manner by OIEC.

103.    Doe's interest in the outcome of the investigation is significant.

    a.    Expulsion from the University of Colorado would deny him the benefits of education at his chosen school.

    b.    Expulsion would damage Doe's academic and professional reputation.

    c.    A finding of responsibility has already damaged Doe's personal reputation.

    d.    Expulsion prevents Doe from re-enrolling at CU and impairs his ability to enroll at a different institution, thus impairing his ability to pursue his higher educational and career prospects.

104.    In June of 2017, the American Bar Association (ABA) released recommendations to schools regarding sexual misconduct investigations titled "*ABA Criminal Justice Section Task Force on College Due Process Rights and Victim Protections: Recommendations for Colleges and Universities in Resolving Allegations of Campus Sexual Misconduct*."  In their recommendations the ABA calls for a "prompt, fair, and impartial investigation." *Id.* at I.b. The ABA declared a preference for an adjudicatory model (where both parties are entitled to be present, evidence is presented, and the decision-makers determine whether a violation of school policy occurred), versus the investigatory model (where the decision-maker only considers the report and, in the case of the University of Colorado, is also the person who gathered information and wrote the report). *Id.* at IIb. The ABA cited concerns about possible investigator bias. *Id.* The ABA recommends that there should be a right to appeal. III-F. The ABA specifically

recommends an adjudicatory hearing which is recorded, has live testimony, and offers

an opportunity to question witnesses to determine whether or not the respondent is

responsible. *Id.* at IV. The ABA recommends that a panel of at least three people

independent of the investigator decide whether a violation occurs. *Id* at V. The ABA

addresses the question of burden of proof:

> a.      For a three-person panel, independent from the investigator, after an in-
> person hearing, the ABA found that a student could be held responsible *by a*
> *unanimous vote* (emphasis added) if "there is sufficient evidence that is relevant,
> probable, and persuasive to them that the respondent engaged in the alleged
> misconduct, and that the evidence supporting a finding of responsibility
> outweighs any evidence that the respondent is not responsible for the
> misconduct." *Id* at V-D.

> b.      For a single decision-maker, as in the model that CU uses, the ABA
> recommended a higher level of proof while acknowledging this was not in line
> with the 2011 "Dear Colleague Letter."  The ABA recommended that the
> decision-maker "should only find the respondent responsible for alleged
> misconduct if the evidence *firmly* convinces the decision-maker to reasonably
> conclude that a finding of responsibility is justified. Put another way, the decision-
> maker should find that there is sufficient evidence that is relevant, probable, and
> persuasive to *firmly* convince him or her that the respondent engaged in the
> alleged misconduct, *and that the evidence supporting a finding of responsibility*
> *significantly outweighs any evidence that the respondent is not responsible for*

*the alleged misconduc*t." *Id.* (Emphasis added.)

105.   Additionally, the ABA specifically states "a particular sanction should not be presumed or required. Instead, the Task Force proposes that sanctioning should be decided on an individualized basis considering the facts and circumstances including mitigating factors about the respondent, the respondent's prior disciplinary history, the nature and seriousness of the offence, and the effect on the victim and/or complainant as well as the university community." *Id* at E.

106.   The defendant violated Doe's due process rights in the following manners:

a.     OIEC investigators failed to provide Doe with adequate notice of the nature of his alleged violation.

b.     By implementing an investigative process which did not record or otherwise preserve any witness' statement and instead utilized summary statements which were redacted by OIEC investigators (who removed information that they alone deemed not relevant).  Doe did not receive adequate notice of the nature of the allegations against him, even pertaining to his review of OIEC file materials.

c.     By implementing an investigative process which failed to place witnesses under an oath or affirmation to tell the truth, thereby rendering witness statements unreliable as to their truthfulness.

d.     By using the preponderance of the evidence standard, which is too low of a standard in light of the fact that the University could impose a sanction of expulsion, directly against Doe's property right.

e.      By refusing to place the burden of proof on the school or the accuser,

which places the burden on Doe.

f.      The investigators have a demonstrated bias against those accused of

sexual misconduct, the majority of whom are males. By way of example:

1.      In Doe's case, the OIEC investigators found multiple discrepancies

that they failed to properly resolve.

2.      OIEC employs a victim-centric model of investigation, under which

Doe was denied his right to remain silent.  OIEC policies and procedures

allow investigators to assign a finding of responsibility based solely on a

complainant's statement using the preponderance of the evidence

standard.

3.      Under OIEC's process at CU Boulder, Doe was presumed

responsible and had to prove himself innocent. The "affirmative consent"

standard, coupled with the preponderance of the evidence standard, shifts

the burden to respondents to prove their innocence. Because of this

burden shifting standard, Doe was punished with a finding of responsibility

as a result of his exercising of his Fifth Amendment right in the face of a

parallel investigation by BPD agents.

4.      OIEC failed to consider alternate suspects.

5.      Despite the American Bar Association's concerns about

presumptive punishments and the Bar's admonishment to consider factors

regarding the respondent, CU has presumed penalties. In this case,

despite having many options available, CU Boulder will only consider

suspension or expulsion. Further, the only enumerated considering Doe

himself is whether or not he took responsibility for his behaviors. CU does

not consider a Respondent's individual needs or merit when making a

sanctioning decision.

107.   Doe asserts that OIEC's Policies and Procedures, as applied to Doe by the

defendant working in his official capacity, violate the Due Process clauses of the United

States Constitution.  The defendant disputes this assertion.

108.   The defendant has a duty to enforce the provisions of the OIEC Policies but has

instead unfairly and inappropriately enforced those policies against Doe.  The

investigation and sanctions against Doe were arbitrary and capricious. The defendant

was aware of the investigation against Doe and did nothing to correct the Constitutional

shortcomings.

109.   Doe is entitled to a declaration that the OIEC Process, as applied to him, violates

the Due Process clauses of the United States Constitution.

110.   Pursuant to 42. U.S.C. § 1988, Doe is entitled to his attorney's fees incurred in

bringing this action.

## VIII. COUNT II.

## (DECLARATORY JUDGMENT- VIOLATION OF DUE PROCESS PROVISIONS OF

## THE CONSTITUTION OF THE STATE OF COLORADO)

111.   Plaintiff repeats and incorporates all of the allegations of this Complaint as if fully

set forth herein.

112.     This Count is brought against Defendant DiStefano in his official capacity.

113.     Article 2, § 16 of the Constitution of the State of Colorado provides that the accused shall enjoy the "right to appear and defend in person and by counsel; . . . to meet the witnesses against him face to face . . . and a speedy public trial *by an impartial jury . . .*" (emphasis added).

114.     Article 2, § 18 grants the right against self-incrimination, and Article 2, § 25 declares that "no person shall be deprived of life, liberty or [sic] property, without due process of law."

115.     The Due Process clauses of the Constitution of the State of Colorado are implicated by higher education disciplinary decisions, including the disciplinary decisions under the University of Colorado OIEC Process and Procedures.

116.     CU has a constitutional obligation to provide a fundamentally fair and reliable process.

117.     Doe is entitled, under the Constitution of the State of Colorado, to the opportunity to be heard in a meaningful manner by OIEC.

118.     Defendant violated Doe's rights under the Constitution of the State of Colorado in the same manner that he violated Doe's rights under the Constitution of the United States, as alleged in Count 1.

119.     Doe is entitled to a declaration that the OIEC Process, as applied to him, violates the Due Process clauses of the Constitution of the State of Colorado.

120.     Pursuant to C.R.S. § 14-10-119, Doe may be entitled to his attorney's fees incurred in bringing this action.

## IX.    COUNT III.

## (42 U.S.C. § 1983—VIOLATION OF DUE PROCESS PROVISIONS OF THE UNITED STATES CONSTITUTION)

121.    Plaintiff repeats and incorporates all of the allegations of this Complaint, as if fully set forth herein.

122.    This Count is brought against Defendant DiStefano in his official capacity for injunctive relief.

123.    The defendant acted under color of law in violating Doe's rights under the 5th and 14th Amendments to the United States Constitution.

124.    The defendant acted intentionally and with callous disregard for Doe's clearly established constitutional rights.

125.    The defendant's actions against Plaintiff have caused and continue to cause substantial, immediate, and continuing damage to him, to include prejudicing his acceptance into other academic institutions (including community college), diminishing his reputation, and causing undeniable anxiety and depression.

126.    Pursuant to 42 U.S.C. § 1983, Doe is also entitled to have any record of the investigation and subsequent sanction expunged from his academic record and to have his identity remain confidential.

127.    Pursuant to 42 U.S.C. § 1988, Doe is entitled to his attorney's fees incurred in bringing this action.

## X. COUNT IV.

## (BREACH OF CONTRACT)

128.   Plaintiff repeats and incorporates all of the allegations of this complaint as if fully set forth herein.

129.   This Count is brought against Defendant The Board of Regents.

130.   Based on the aforementioned facts and circumstances, CU Boulder created express and implied contracts when Plaintiff accepted an offer of admission to CU Boulder and paid tuition and fees. In consideration of this payment, CU Boulder published policies and procedures applicable to Doe and other students attending CU Boulder and made a warranty that they would follow those policies and procedures.

131.   Based on the foregoing facts and circumstances, CU breached express and implied agreements with Doe.

132.   A non-exhaustive list of CU Boulder's breaches throughout its investigation of the Plaintiff include the following;

a.      Failure to conduct a fair, prompt, unbiased, impartial, and equitable investigation as provided in its own policy overview, mission statement, and process.[xxix]

b.      Failure to comply with Art. 1 of the Law of the Regents by not acting in good faith; by not being personally accountable for individual actions such as overriding the Complainant's request for privacy; by not conscientiously fulfilling obligations towards others in terms of providing notice and due process; and by failing to communicate ethical standards of conduct through instruction and

example, such as not permitting a fair inspection of investigative records and not providing adequate information to justify continuing an investigation over the objection of a Complainant.

c.      Failure to comply with policies established by the Board of Regents[xxx]  by not conducting the investigation ethically, and in compliance with OIEC Process, Due Process, Title IX, and university policies[xxxi].

d.      Discrimination in the investigation of Doe on the basis of sex in violation of federal law and university policy.[xxxii]

e.      Failure to adequately notify Doe of allegations and failing to properly preserve witness statements by choosing not to record and preserve said statements and instead actively redacting information from witness statements that investigators alone determine is not relevant; failing to provide unredacted witness statements prior to demanding a statement from Doe, to include SANE and police reports; by failing to respond to reasonable inquiry by Doe about why the investigation was continuing over the complainant's request; by unreasonably restricting Plaintiff during the one time he was permitted to review investigative materials immediately before issuing a Final Report.

f.      Failure to provide meaningful opportunity to respond to allegations presented.

g.      Failure to properly analyze the information gathered during the investigation and instead concluding that it is "more likely than not" that the

conduct occurred[xxxiii] despite the fact that the evidence was insufficient to sustain even this low burden of proof.

133.    Simons, the OIEC director, in deciding to proceed with an investigation of Doe over the objections of the Complainant, reviewed investigative materials and engaged in a fact-finding endeavor specifically related to the events of Doe's case.[xxxiv]

134.    Simons failed to adequately memorialize, identify, and meaningfully provide Doe with the basis on which she was conducting an investigation over the complainant's objection.

135.    OIEC process separates the investigative function from any sanction that should result from a finding of responsibility. [xxxv]

119.    By exercising her authority under Section F of the OIEC Process, Simons made herself a part of the investigation while she should have instead recused herself from consideration of any sanction in the Doe matter in order to provide Doe with a fair, unbiased, impartial, and equitable investigation.

136.    Defendant DiStefano was aware of Simon's actions in this case and did nothing to ensure a fair disciplinary process. Defendant The Board of Regents is responsible for the conduct of Defendant DiStefano.

## XI. COUNT V.

## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

137.    Plaintiff repeats and incorporates all of the allegations of this Complaint as if fully set forth herein.

138.    This Count is brought against Defendant The Board of Regents.

139.     Based upon the aforementioned facts and circumstances, CU Boulder breached

and violated the covenant of good faith and fair dealing expressed and implied in its

contract with Plaintiff by making an unsupported finding of responsibility and by meting

out the disproportionately severe sanction of expulsion where there was a lack of

credible evidence concerning the claims against him.

140.     As a direct, reasonable, and foreseeable consequence of this breach, Plaintiff

sustained damages including, without limitation, emotional distress, economic injuries,

the inability to complete his studies at CU Boulder, detrimental impact on his future

career and higher education prospects, and other direct and consequential damages.

141.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be

determined at trial plus prejudgment interest, attorneys' fees, expenses, costs, and

disbursements.

## XII. COUNT VI.

## (ESTOPPEL AND RELIANCE)

142.     Plaintiff repeats and incorporates all of the allegations of this Complaint as if set

forth herein.

143.     This Count is brought against Defendant The Board of Regents.

144.     CU Boulder's various policies constitute representations and promises by CU

Boulder that the university should reasonably expect to induce action or forbearance by

Plaintiff.

145.     CU Boulder expected (or should have reasonably expected) Plaintiff to accept its

offer of admission, to incur tuition and fee expenses, and choose to not attend other

universities based on its express and implied promises that CU Boulder would not tolerate, and Plaintiff would not suffer, harassment by fellow students and would not deny Plaintiff his procedural rights should he be accused of a violation of CU Boulder's policies.

146.    To his detriment, Plaintiff relied on these express and implied promises and representations made by CU Boulder.

147.    Based on the foregoing, CU Boulder is liable to Plaintiff based upon the principal of estoppel.

148.    As a direct, reasonable, and foreseeable consequence of these breaches, Plaintiff has sustained damages including, without limitation, emotional distress, economic and reputational harm, an inability to complete his studies at CU Boulder, and other direct and consequential damages.

149.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial plus pre-judgment interest, attorneys' fees, expenses, costs, and disbursements.

## XII.  PRAYER FOR RELIEF

150.    Plaintiff respectfully requests the following relief:

a.    On Count I, judgement declaring that the OIEC Policy, as applied to this case, violates the Due Process clause of the United States Constitution.

b.    On Count II, judgment declaring that the OIEC Policy, as applied to this case, violates the Due Process clause of the Constitution of the State of Colorado.

c.      On Counts III-VI, Judgement in favor of Doe awarding damages in an amount to be determined at trial.

d.      Removal of the expulsion order issued by OIEC, thus allowing Doe to enjoy a clear transcript and restoration of his status as a student, prohibiting further disciplinary proceedings against him, removing any mention of the OIEC investigation and subsequent sanction from his record, and enjoining the defendant and his agents from disclosing his true identity.

e.      Court costs, interest, and other reasonable expenses incurred in maintaining this action, including reasonable attorneys' fees as authorized by 42 U.S.C. § 1988, C.R.S. 14-10-119, and any other statute permitting recovery of attorneys and costs.

## XIII. Jury Demand

151.   Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted this 11th day of July, 2018.

/s/   *Lawrence S. Mertes*
                Lawrence S. Mertes, P.C.
                2235 Broadway
                Boulder, CO 80302-4824
                Telephone: 303-440-0123
                Facsimile: 303-449-2656
                Email: Larry@merteslaw.com
                Counsel for: John Doe

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2018, I electronically filed the foregoing, including the referenced attachments, with the Clerk of the Court using the Electronic Case Filing System.

/s/____*Lawrence S. Mertes*

---

i The Office of Institutional Equity and Compliance (OIEC) was created in August 2014 when all investigations into allegations of harassment and discrimination — whether against a student or an employee — were integrated into one office. OIEC includes the former Office of Discrimination and Harassment (ODH, created in 2005) and the harassment and discrimination investigations formerly conducted through the Office of Student Conduct and Conflict Resolution (OSC). OIEC enforces the University of Colorado Sexual Misconduct Policy, the University of Colorado Boulder Discrimination and Harassment Policies and Procedures, and the University of Colorado Policy on Conflict of Interest in Cases of Amorous Relationships. OIEC addresses all complaints of discrimination and harassment for the CU Boulder campus using the methods described in OIEC's Process and Procedures.  The Executive Director of OIEC, on behalf of the entire OIEC team, serves as the campus Title IX Coordinator for CU Boulder.  Source: https://www.colorado.edu/institutionalequity/home/about-us

ii https://www.justice.gov/crt/overview-title-ix-education-amendments-1972-20-usc-1681-et-seq

iii For purposes of this chapter an educational institution means any public or private preschool, elementary, or secondary school, or any institution of vocational, professional, or higher education, except that in the case of an educational institution composed of more than one school, college, or department which are administratively separate units, such term means each such school, college, or department.*(Pub. L. 92-318, title IX, Sec. 901, June 23, 1972, 86 Stat. 373; Pub. L. 93-568, Sec. 3(a), Dec. 31, 1974, 88 Stat. 1862; Pub. L. 94-482, title IV, Sec. 412(a), Oct. 12, 1976, 90 Stat. 2234; Pub. L. 96-88, title III, Sec. 301(a)(1), title V, Sec. 507, Oct. 17, 1979, 93 Stat. 677, 692; Pub. L. 99-514, Sec. 2, Oct. 22, 1986, 100 Stat. 2095.)*

iv See generally U.S. Dept. of Education, Office for Civil Rights, Revised Sexual Harassment Guidance: *Harassment of Students by School Employees, Other Students, or Third Parties – Title IX (2001)* at 19-20 & nn 98-101.

v https://www2.ed.gov/about/offices/list/ocr/frontpage/faq/rr/policyguidance/sex.html

vi 34 CFR 106.9 and 106.8(b)

vii 2016-17 Student Conduct Code, Policies & Procedures, p 5-9.

viii A responding student may only appeal if the sanctions of formal disciplinary probation, termination of housing contract, suspension, or expulsion were imposed. All appeals must be made in accordance with procedures outlined in this section. The appeal is the final step in the conduct process. An appeal does not provide a second hearing of the case. The review on appeal will be based on the existing record, or new information provided per J.2.a.iii below. The information provided to the appeal officer in the student's request for appeal and information the conduct officer may present regarding the rationale for the decision. Deviation from the procedures in this code will not invalidate a proceeding or decision or be a basis for appeal except where such deviation has clearly resulted in significant prejudice to a responding student or complainant. 2016-17 Student Conduct Code, Policies & Procedures (J)(1), p 9. A student may appeal upon one or more of the following grounds: i. The established procedures were not followed in a significant way and as a result, the factual findings, the sanction, or both, were not correct. ii. The severity of the sanction imposed was not appropriate based on the nature of the violation or the circumstances. In cases in which a responding student has accepted responsibility, such appeals are limited to having the severity of the sanction reviewed. There is new information that would have been material to the outcome, had the information been presented at the student conduct meeting. The new information must be included with the student's request for appeal. Also, the student must show that the

new information was not known to the person appealing at the time of the original student conduct meeting. 2016-17 Student Conduct Code, Policies & Procedures (J)(2)(a), p 9. If a case is appealed, and unless the welfare of a person or the community is threatened, all of the sanctions imposed in the case will not go into effect until either the deadline for filing an appeal passes and no appeal is filed or, if a timely appeal is filed, the appeal is decided, whichever comes first. An appeal must be filed by the date specified in the original decision letter from the Office of Student Conduct and Conflict Resolution. If a student files an appeal, they will be informed of the outcome when the appeal process has been completed. An appeal will only be considered if it includes the request to appeal form, the student's criteria for appeal and rationale for appeal. It is the student's obligation to pro-vide any and all materials they wish to have considered at the time of appeal submission. Subsequent information and/or revisions to the appeal will not be accepted. The Director of the Office of Student Conduct and Conflict Resolution or their designee will make the decision as to whether these conditions have been met. A student may file an appeal by delivering it to the Office of Student Conduct and Conflict Resolution.  2016-17 Student Conduct Code, Policies & Procedures (J)(2)(b), p 9. There are no student appeals for the following: 1.) Colorado law regarding hazing: 2.) Amnesty Policy; and 3.) Colorado law regarding riots. 2016-17 Student Conduct Code, Policies & Procedures (J)(2)(c), p 9.

[ix] The responding student may submit questions to the conduct officer to be asked of the witnesses but is not entitled to be present during the conduct officer's interview of witnesses, including the victim. It is within the discretion of the conduct officer to decide whether to ask the witnesses any question(s) submitted by the responding student.  2016-17 Student Conduct Code, Policies & Procedures (3)(c)(iii), p6.

[x] 2001 Guidance at (IX); see also 34 C.F.R. § 668.46(k)

[xi] 34 C.F.R. § 668.46 (k)(1)(i)

[xii] 34 C.F.R. § 668.46(k)(1)(ii). 20 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[xiii] OIEC advised Doe that applicable procedures would be applied by the then current 2016-17 Process and Procedures Code while the issue of conduct would be evaluated under the 2015-16 Process and Procedures Code. Reference: Final Report, p1, fn1

[xiv] OIEC Process, (G) p 9-10.

[xv] OIEC Process, (G) p 10

[xvi] OIEC Process, (H)(6)(ii), p 12-13

[xvii] OIEC Process, (H)(6)(h)

[xviii] https://www.colorado.edu/institutionalequity/file-report/guidelines-filing-complaint

[xix] Complainant initially told BPD agents that had consumed "only one or two shots for the whole evening" prior to her friends leaving to get food.  Ref. Final Report, P4 (Summary of BPD report).

[xxi] Doe noted in his WES Reply that the allegations that have been presented would constitute, if proven, serious felony crimes under Colorado law with penalties that include, but are not limited to, a forfeiture of freedom in the form of sentencing that could include an indeterminate to life sentence of consisting of prison, and/or jail, intensive supervised probation, parole, community corrections, mandatory registration as a sex offender, and sex offender specific treatment for potentially as long as Doe's natural life. C.R.S. §§ 18-3-402, 18-3-404, 18-1.3-1004-1012, 16-22-101-115, and 16-11.7-101 to 109.

xxii The W1 video was made a part of the OIEC investigative file but was never copied and provided or displayed to Doe, nor was equipment to view or time allotted by investigators during Doe's single one-hour opportunity to view the OIEC file on January 23, 2017.

xxiii The only PKP member that the Complainant identified, and in fact, identified as the last person she remembered speaking to before apparently blacking out, was W4.  W4 was never identified or treated as a suspect by OIEC despite this unusual circumstance.  Attachment F (BPD) Report and paragraph 69(e) above.

xxiv OIEC investigators commented in on P39 at FN 55 of the Final Report that this matched the description of both Doe and W4.

xxv Although on P42 at FN 60 of the Final Report OIEC investigators report that that W7 stated that he "heard" that Complainant may have vomited on Doe at some point while she "was on top of him" but then concluded that investigators did not have sufficient information to make a finding in the matter.

xxvi OIEC Investigators, lacking *any* form of verification by Doe or Complainant of who was actually texting rely upon the fact that the phone number listed in Doe's school records matches one of the phone number listed in the text message screenshots.  Source: P10, FN 13, Final Report.

xxvii PART D: ETHICAL CONDUCT OF UNIVERSITY OF COLORADO EMPLOYEES
In pursing the mission of the University of Colorado, all members of the university community are responsible for understanding and upholding the highest standards of legal and ethical conduct. The Board of Regents' policies describe principles of ethical behavior that articulate a basic ethical framework for the decisions, actions and behavior of all University of Colorado employees. These "Principles of Ethical Behavior" define the underlying expectations for the conduct and activities of university employees. http://www.cu.edu/regents/laws-and-policies/regent-laws/article-1-university-colorado-legal-origin-mission-and-ethical
(and)
**1. Responsible Conduct**
University of Colorado employees are expected to conduct themselves ethically, and in compliance with all applicable laws, regulations, and university policies. University employees are expected to practice and model ethical and responsible behavior in all aspects of their work. Expected conduct includes conducting fair and principled business transactions; acting in good faith; being personally accountable for individual actions; conscientiously fulfilling obligations towards others; and communicating ethical standards of conduct through instruction and example. https://www.cu.edu/regents/principles/responsible-conduct
xxvii **3. Conflicts of Interest**
As a state institution, it is imperative for both legal and ethical reasons that university employees do not improperly benefit from their positions of trust at the university. University employees are expected to avoid actual and perceived conflicts of interest related to their work and position. Actual or potential conflicts must be appropriately disclosed in accordance with university conflict of interest and conflict of commitment policies, so that such conflicts may be reviewed, and as appropriate, managed or eliminated. Employees are responsible for identifying potential conflicts and seeking appropriate guidance. http://www.cu.edu/regents/policy-1c-principles-ethical-behavior
(and)
**Title IX compliance, efforts to reduce sexual harassment and assault outlined**
The Board of Regents reinforced its commitment to Title IX compliance, including ending sexual harassment and sexual assault on its campuses and working with victims to ensure speedy and **fair investigations** into allegations of misconduct. https://www.cu.edu/faculty-council/news/title-ix-compliance-efforts-reduce-sexual-harassment-and-assault-outlined https://www.cu.edu/faculty-council/news/title-ix-compliance-efforts-reduce-sexual-harassment-and-assault-outlined

xviii Page 6, **Determination Regarding Obligation to Provide a Safe and Non-Discriminatory Environment**
In response to a request that she identify which, if any of the eleven factors, justified proceeding over the alleged victim's direct request to not investigate the matter Ms. Simons, rather than identifying the factors asserted that the one hour viewing of a box of OIEC's investigative materials, with explicit orders that nothing could be copied or recorded, responded on February 14, 2017 that "[t]hat information was available when your colleague … inspected the files on January 23, 2017."

xxix OIEC Process, (A) p2 … "To achieve this mission, OIEC conducts fair and unbiased investigations and treats all individuals who seek our assistance with respect and dignity;" OIEC Investigators, (H)(4) p 12: Investigations will be conducted by staff who are appropriately trained and have qualifications and experience that will facilitate a prompt, fair equitable and impartial investigation; Title IX Coordinator, (I)(b) p 17: At the University, the Executive Director of the OIEC is also the Title IX Coordinator. The responsibilities of the Title IX Coordinator pursuant to the University of Colorado Sexual Misconduct Code include …b. Overseeing adequate, reliable, and impartial investigations of complaints of misconduct.

xxx **3. Conflicts of Interest.**  As a state institution, it is imperative for both legal and ethical reasons that university employees do not improperly benefit from their positions of trust at the university. University employees are expected to avoid actual and perceived conflicts of interest related to their work and position. Actual or potential conflicts must be appropriately disclosed in accordance with university conflict of interest and conflict of commitment policies, so that such conflicts may be reviewed, and as appropriate, managed or eliminated. Employees are responsible for identifying potential conflicts and seeking appropriate guidance.

xxxi (Regent Policy 1.C.1).

xxxii CU Process advises that "The Process and Procedures is also intended to be 'campus complaint process and procedures' pursuant to the University of Colorado Sexual Misconduct Policy and the University of Colorado Boulder Discrimination and Harassment Policy and should be read in conjunction with those policies … (A) p.3; Discrimination and Harassment Policy and Procedures.
II. POLICY STATEMENT  A. **Discrimination, Harassment and/or Related Retaliation Prohibited**

1. CU-Boulder prohibits *discrimination,[1] harassment* and/or related *retaliation* based on *protected class* in admission and access to, and treatment and employment in, its educational programs and activities.[2] For purposes of this CU-Boulder policy, "*protected classes*" refers to race, color, national origin, sex, pregnancy, age, disability, creed, religion, sexual orientation, gender identity, gender expression, veteran status, political affiliation, or political philosophy. Source: https://www.colorado.edu/policies/discrimination-and-harassment-policy-and-procedures, and **Respect for Others (Regent Policy), which provides:** The University of Colorado recognizes that people are the most important resource in accomplishing its mission in the areas of teaching, research, community service, and patient care. The University of Colorado values academic freedom, diversity, and respect for all persons. The university is committed to the principle of non-discrimination and does not tolerate harassment on any basis, including **sex**, race, ethnicity, religion, **,** sexual orientation, gender identity, gender expression, age, political affiliation, or political philosophy. University employees are expected to treat colleagues, co-workers, and students with respect, professionalism, and dignity in all interactions and communications (Regent Policy 1.C.2).

2. **Respect for Others**

   The University of Colorado recognizes that people are the most important resource in accomplishing its mission in the areas of teaching, research, community service, and patient care. The University of Colorado values academic freedom, diversity, and respect for all persons. The university is committed to the principle of non-discrimination and does not tolerate harassment on any basis, including sex, race, ethnicity, religion, gender, sexual orientation, gender identity, gender expression, age, political affiliation,

or political philosophy. University employees are expected to treat colleagues, co-workers, and students2 with respect, professionalism, and dignity in all interactions and communications (Regent Policy 1.C.2).

xxxiii OIEC Process, (H)(c) p 13-14 (Standard of Review/Burden of Proof).

xxxiv OIEC Process, Determination Regarding Obligation to Provide a Safe and Non-Discriminatory Environment. (F) P7; (I)(c) "Evaluating any complainant request for privacy pursuant to Section (E) sic."

xxxv OIEC Process, (F) p7