**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-1462-WJM-SKC

JOHN DOE,

     Plaintiff,

v.

THE BOARD OF REGENTS FOR THE
UNIVERSITY OF COLORADO, and,
PHILIP DISTEFANO, Chancellor for the
University of Colorado Boulder,

     Defendants.

---

## DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY

---

Defendants Board of Regents for the University of Colorado and Philip DiStefano hereby move to exclude the expert testimony of Michael Freeman and Hanna Stotland. As grounds for this motion, Defendants state the following:

## INTRODUCTION

Plaintiff has engaged experts Michael Freeman and Hanna Stotland.

Freeman claims expertise in forensic medicine and forensic epidemiology. Freeman Report 1. Freeman states that his prior testimony has centered on the evaluation of test accuracy and the potential it creates for false positive and false negative results. Freeman Dep. 16:12-19. By contrast, Freeman's testimony here focuses on whether the University's Title IX investigative processes "place the accused individual at a greater risk of 'false positive guilty' than if [it] was conducted within the U.S. criminal justice system." Freeman Report 5.

Stotland works as an educational consultant, specializing in students facing "challenging circumstances," including school discipline. Stotland Report 1. Stotland's testimony concludes that, as a result of Plaintiff's expulsion for sexual assault and his GPA that she believes flowed from that expulsion, he will have difficulty transferring to another school and applying to jobs. Stotland Report 5-6. In addition to assessing his future prospects, Stotland generalizes that students in Plaintiff's position may suffer "social struggle, sense of disconnection, and loss of confidence." Stotland Report 6.

## STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has opined that FRE 702 makes the district court a "gatekeeper" to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow. Pharm.*, 509 U.S. 579, 589 (1993). The proponent of an expert's testimony bears the burden to demonstrate that the expert is qualified under FRE 702. *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

## ARGUMENT

1. The testimony of Freeman should be excluded under FRE 702.

    a. *Freeman does not possess specialized knowledge that will help the trier of fact understand the evidence.*

To be qualified, an expert must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (internal quotations omitted). This is a threshold inquiry. If the court finds an expert unqualified, the court need not address the reliability of the conclusions. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001).

Freeman's academic training is in forensic medicine and forensic epidemiology. He possesses a medical degree, a Ph.D in public health/epidemiology, and an MPH in epidemiology and biostatistics. Freeman Report 1. None of these disciplines has any obvious connection to the facts put in issue by Plaintiff's Second Amended Complaint, and Freeman's summary of his testimony provides no further enlightenment on this point. Freeman states that he deals "with how probabilistic information is used to prove guilt or innocence in criminal matters," and that his field has a "lot to do with test accuracy and how it's used in a forensic setting." Freeman Dep. 16:6-8, 16:12-14. Freeman's specialized knowledge is germane to determining the risk of false positives when assessing forensic evidence that, for example, determines a victim's position in a car crash. Freeman Dep. 17:3-24.

He does not typically provide "opinions about the way a system is functioning." Freeman Dep. 13:12-14. While he has testified in hundreds of cases, he does not recall previously testifying in a case involving university discipline (with one possible exception), Title IX, or a comparison between criminal due process and university discipline. Freeman Dep. 14-15. Indeed, he admitted that the idea of comparing criminal due process to the university disciplinary system was "very foreign to him." Freeman Dep. 15:24. At bottom, Freeman has no professional experience in university discipline or Title IX to support any opinion he might hold on university

3

disciplinary investigations or disciplinary system operation, as the relative procedural guarantees in a criminal and administrative tribunal do not implicate questions of forensic medicine or epidemiology.

   b.  *Freeman's testimony is not based on facts or data.*

"To be reliable, expert testimony must be based on actual knowledge, and not mere subjective belief or unsupported speculation." *Pioneer Ctrs. Holding Co. ESOP & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341-42 (10th Cir. 2017) (internal citations and quotations omitted). "When expert opinion is not supported by sufficient facts to validate it in the eye of the law … it cannot support a jury's verdict and will be excluded." *Id. at* 1342.

Freeman offers no facts in support of his expert opinion. He recites his own understanding of the kind of guarantees that are available to a criminal defendant in a criminal case. *See, e.g.,* Freeman Report 3. He provides no citations or legal authority to evidence that this is an exhaustive list, or to explain why differing procedural protections in disciplinary proceedings may affect the outcome. He conclusorily asserts that each of these items leads to an "increased risk" of "false positive," *id.* at 6, but without providing any numerical estimate of how these procedural matters impacted the case. He explains that his analysis is either "qualitative" or "semi-quantitative," Freeman Dep. 79:17-19, and states that he did not consider any numerical data in reaching his conclusion. Freeman Dep. 81:18. For some of what he characterizes as procedural deficiencies in university process, he is unable to point to specific facts about the impact of these claimed deficiencies. For example, he was not able to state in his deposition what he believed was redacted from the witness statements before Plaintiff reviewed them, nor is he able to point to anything in OIEC procedures to support his assertion that respondents do not receive a presumption of innocence. Freeman Dep. 70:20-21; 37:3-10.

Freeman's bare assertion about the risk of false positives, and his vague conclusions regarding some aspects of the investigation, stand in marked contrast to how he testifies in cases where he offers expert testimony on test accuracy and forensic evidence. He states that in those cases he does assign a number value to the risk of a false positive. Freeman Dep. 21:15. Freeman's characterization of increased risk, offered with no data-based grounding in his own discipline, amounts to "unsupported assertion[]," *Pioneer Ctrs. Holding Co.*, 858 F.3d at 1342, and is based only on his own belief that that the university should not discipline conduct that could also be the subject of a police investigation. Freeman's bare assertions simply do not satisfy the FRE 702(b) standard that expert testimony be based on facts or data.

Freeman's testimony also includes misstatements of fact and law. While Freeman purports to be an expert on the intersection of medicine and law, the only direct legal citation in his statement is to a Colorado statute regarding sexual assault, which again, is not at issue in this case. Freeman Report 2. Freeman frequently uses the terminology of criminal law, for example, using the word "guilty" repeatedly even though the university's Title IX adjudicative process does not result in criminal penalties and flows from its obligations under civil rights law. *See, e.g.,* Freeman Dep.11:1-3. Despite his incorrect belief that the university's investigation was criminal in nature, he misstates at least one black-letter element of criminal law, suggesting that the "clear and convincing" evidentiary standard might be applicable in the criminal context. Freeman Report 1.

Freeman also incorrectly asserts that there are no comparable university administrative processes for non-sexual crimes, such as murder, or other circumstances in which an individual could be held criminally responsible for an act otherwise punishable by prison. Freeman Report 4. After so asserting in his Report, Freeman conceded in his deposition that the university

disciplinary process could be applied to at least some physical assault (without a clear

demarcation of which) and that the same conduct could result in both criminal prosecution and

tort lawsuits. Freeman Dep. 50:3-8. In fact, Plaintiff's own Complaint cites current and formal

federal guidance on university sexual assault investigations, impliedly conceding the

University's authority to discipline students for conduct which may also be criminal. *See, e.g.*,

Second Amended Complaint, ¶¶ 142-43.

Finally, while speaking at length regarding the requirements of due process, Freeman

seems unaware of the legal framework for assessing due process in university discipline, which

balances the right at interest with the potential deprivation. *Compare Bd. of Curators of Univ. of

Mo. v. Horowitz*, 435 U.S. 78, 86 n.3 (1977) (opining that, in evaluating what process is due in

different kinds of university discipline, the court must weigh the right at interest and the severity

of the deprivation against a number of other factors); *with* Freeman Dep. 28:13-15 (asserting that

due process is not required in university settings for non-criminal matters).

Freeman's misstatements of facts and law reflect the inadequacy of Freeman's

purportedly specialized knowledge to shed light on any issue in the case. He appears to be

unfamiliar with the basic framework of university discipline and related case law. Instead,

Freeman's testimony stands only for the common-sense proposition that criminal trials are more

procedurally elaborate than non-criminal disciplinary proceedings.

*c.   Freeman's testimony is not the product of reliable principles and methods.*

Freeman does not apply any clear principle or method to reach his conclusion regarding

the risk of what he calls a "false positive guilty" in a university Title IX administrative

proceeding. He states that he did not assign a probability to a false positive in this case as he does

6

when "applying a test to evidence" in the criminal arena. Freeman Dep. 21:11-25, 22:1-3. Much of Freeman's opinion simply states facts that are self-evident, namely that criminal proceedings with criminal penalties involve different procedural safeguards than other procedures in the American legal system. Freeman Report 4-6.

Freeman asserts that various procedural differences between criminal and Title IX investigations may change the risk of error. Freeman Report 5-6. However, he does not apply any particular method grounded in his training to determine their qualitative importance to an administrative proceeding, where the standard of proof is lower and the potential sanctions completely distinct from those at issue in a criminal system (i.e., suspension or expulsion as opposed to imprisonment). He does not attempt to quantify using any accepted method the contribution of particular procedures to different risks of incorrect outcomes. Instead he makes a bare assertion that procedural differences between the two systems "undoubtedly increase[] the risk" of a "false positive guilty," Freeman Report 6, without explaining how he reached this conclusion or acknowledging that criminal guilt is not at stake in the university context. He cites no evidence and no empirical research in support of his conclusion. Freeman Report 4-6.

> d.  *Freeman's testimony is testimony about legal matters.*

Freeman's failures to satisfy the different elements of FRE 702 all stem from the same underlying cause: fundamentally, he seeks to testify about questions of law rather than factual issues within his forensic science expertise.  While an expert witness may testify on an ultimate factual issue, the testimony must actually bear on a factual issue rather than the expert's view of the legal merits. "Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Oakland Oil Co. v. Conoco, Inc.*, 144 F.3d 1308,1328 (10th Cir. 1998). "[T]estimony which articulates and applies

the relevant law … circumvents the jury's decision-making function by telling it how to decide the case." *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir. 1988). "[W]hen the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed." *Id.* at 809-10.

Freeman, with his vast expertise in forensic science, seeks to opine on ultimate legal questions regarding the appropriate level of due process, the proper venue to adjudicate the misconduct charges, and the proper scope of university discipline, each of which are the subject of an entire body of case law and regulatory rulemaking. These are matters for the Court to decide. Courts evaluating these legal issues have built into the very test for due process in student discipline the necessity to weigh the risk of an incorrect result. *See, e.g., Goss v. Lopez*, 419 U.S. 565, 579-80 (1975) (explaining how the minimum guarantees of notice and an opportunity to respond lower the risk of error). Not only is the question of procedural due process entirely unrelated to Freeman's professional training, it is also not a proper subject for *any* expert. Freeman's opinions are at their core not about disputed facts, but instead about how the legal issues in this case should be resolved.

2. The testimony of Hanna Stotland should be excluded under FRE 702

Stotland intends to opine that: (1) Plaintiff's "Title IX record is a major negative factor for admission at competitive schools" and it could impede his ability to apply for jobs; and (2) Plaintiff "has suffered less tangible, but typical, losses as well." Stotland Report 4, 6. Both opinions should be excluded.

a. *Stotland's opinion on the burden on future education and job prospects is not relevant.*

To be relevant, expert testimony must "logically advance[] a material aspect of the case." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011). Presumably, Plaintiff intends to offer this testimony as to damages (even though he asks the Court to clear his educational record). Stotland's thoughts on whether it may be harder for Plaintiff to transfer, what sorts of schools he may get into, and that he may have to apply for more and less desirable jobs, Stotland Report 4-6, don't shed light on damages. Plaintiff himself can testify as to his experience applying to other schools and his decision not to apply for jobs. And Plaintiff's economist has projected damages by comparing a degree-based career path to a career path without a degree. Stotland's opinion that Plaintiff "will have to spend substantially more time and effort on future applications to have a fair chance at joining his similarly situated peers" is simply beside the point when it comes to damages. Stotland Report 6.

Even if Stotland's testimony could somehow shed light on damages, it is too uncertain to be helpful. Stotland acknowledges that "even with the best support, the outcome [of future applications] is uncertain." Stotland Report 6. She similarly acknowledges that even without discipline, Plaintiff's earlier 2.8 GPA would not be a "guarantee" that he could transfer to a particular school. In other words, Stotland "can't tell [her clients] where, at what price, or when" they might "find another path that might eventually get them to their career goals." Stotland Dep. 28:13-22. Amounting to speculation, this testimony must be excluded. *Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1051 (D. Colo. 2011) ("Under Rule 702, admissible expert testimony must be based on actual knowledge and not subjective belief or unsupported speculation") (internal quotation marks omitted).

> *b. Stotland does not possess expertise to opine on issues other than college admissions.*

Further, Stotland should be precluded from offering an opinion on Plaintiff's mental or emotional state. She states that other clients report "shattered" self-confidence and struggle to perform academically. Stotland Report 6. Stotland also asserts, repeating information in an email from Plaintiff, that Plaintiff's F grades in his final semester were a result of the investigation, an assertion that is not within her expertise to evaluate. Stotland Dep. 49:18-25; 50:1-11.

Stotland's expertise is in college admission and transfer counseling. Stotland Report 1-2. She does not assert expertise in mental or behavioral health. In determining whether expert testimony is admissible, the Court "generally must first determine whether the expert is qualified by 'knowledge, skill, experience, training, or education' to offer an opinion." *Nacchio*, 555 F.3d at 1241. Because Stotland is not qualified to speak to the mental, emotional, or social adjustment consequences of transfer after discipline, she should not be permitted to testify on these issues.

WHEREFORE, Defendants respectfully respect that the Court exclude the expert testimony of Michael Freeman and Hanna Stotland.

**DATED:**  September 12, 2019.

Respectfully submitted:

*s/ Erica Weston*
Erica Weston
Senior Associate University Counsel
University of Colorado
Office of University Counsel
1800 Grant Street, Suite 700
Denver, CO  80203
303-860-5691
Erica.Weston@cu.edu
*Attorney for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2019, I electronically filed the foregoing with the Court's electronic filing system (CM/ECF), which will automatically cause notification to be sent to the following counsel of record:

Lawrence S. Mertes
Lawrence S. Mertes, P.C.
2235 Broadway
Boulder, CO  80302-4824
Email:  Larry@merteslaw.com
*Attorney for Plaintiff*

*s/ Linda Ruth Carter*
Linda Ruth Carter, Paralegal